COURT OF APPEALS OF VIRGINIA

PUBLISHED

Present:    Judges Russell, Lorish and Senior Judge Annunziata
Argued by videoconference


JACQUES LAMAR WALKER

v.        Record No. 1211-20-4

COMMONWEALTH OF VIRGINIA

OPINION BY
JUDGE WESLEY G. RUSSELL, JR.
APRIL 5, 2022


FROM THE CIRCUIT COURT OF PRINCE WILLIAM COUNTY
Steven S. Smith, Judge

Catherine French Zagurskie, Chief Appellate Counsel (Virginia
Indigent Defense Commission, on briefs), for appellant.

Katherine Quinlan Adelfio, Assistant Attorney General (Mark R.
Herring,[1] Attorney General, on brief), for appellee.


Jacques Lamar Walker was convicted in a jury trial of abduction for pecuniary benefit,

four counts of robbery, and four counts of use of a firearm in the commission of those robberies,

three of which constituted second or subsequent offenses. On appeal, he contends the evidence

was insufficient to allow the jury to consider whether he committed the offense of abduction and

that the trial court erred in its sentencing instructions by instructing the jury that three of the four

convictions for use of a firearm in the commission of a felony were to be considered "second or

subsequent" convictions under Code § 18.2-53.1. He also asserts the trial court erred by

allowing a witness who had not identified him outside of a court proceeding to identify him in

court as the robber. Finally, he contends that the trial court erred in denying his motion to

suppress the evidence obtained from a search of his cell phones. For the reasons that follow, we

disagree with Walker and affirm the judgment of the trial court.

---

[1] Jason S. Miyares succeeded Mark R. Herring as Attorney General on January 15, 2022.

BACKGROUND

"In accordance with familiar principles of appellate review, the facts will be stated in the light most favorable to the Commonwealth, the prevailing party at trial." *Gerald v. Commonwealth*, 295 Va. 469, 472 (2018) (quoting *Scott v. Commonwealth*, 292 Va. 380, 381 (2016)). On appeal, we discard any of appellant's conflicting evidence, and regard as true all credible evidence favorable to the Commonwealth and all inferences that may reasonably be drawn from that evidence. *Id.* at 473.

On May 23, 2016, at about 3:40 p.m., a man carrying a black handgun entered the front door of a Wells Fargo Bank. He was wearing a mask covering his nose and mouth, a gray hoodie, and a yellow vest.

Edlin Cottrell, a teller at the bank, stated that the man "barge[d] in," and upon hearing a scream she ducked behind her desk. The man was pointing a gun "at everyone" and told employees to put money in a bag he was carrying. Cottrell put about $2,000 from her drawer in the bag. A bank surveillance video that was played at trial showed the masked man enter the bank just as Cottrell had recounted. Cottrell described the man as black, "not skinny but not fat," and taller than her height of five feet, but she could not say by how much. Cottrell further characterized the man as "serious" and "demanding."

Another teller, Teona Letodiani, recalled the robber pointing his gun "everywhere" and demanded money in a "rushed" tone.

Irene Caison, the service manager for the bank, screamed upon seeing the masked, armed man. She stated that the robber went "[s]traight to the teller line." He then struck a customer, José Galvez, "to remove the customer away from [Letodiani's] station." The man pointed his gun toward the tellers, demanding, "Give me all of your money." Because she was afraid, Caison knelt behind the counter, but when the man said he was "not playing," she pulled herself

out from behind the teller counter and put money in the man's bag. Caison testified that some of the bank's money was wrapped in currency straps marked with the Wells Fargo Bank stamp, the bank branch number, a date stamp, and the initials of bank employees.

Caison stated that the robber was "very close" to her, "within arm's reach," and she could have touched him. Caison testified that she "was looking at [the robber]. [She] was staring at his eyes, because that's all [she] could see." Caison positively identified Walker in court as the robber. She testified that she recognized him from "his eyes," stating, "I remember his eyes."

José Galvez was speaking to a teller at the counter when suddenly he heard a voice coming from behind him.[2] He turned and saw a man wearing a yellow vest come near him. The man, holding a gun in his right hand, struck Galvez across the face and neck with his right arm. In response to being hit, Galvez said he "threw myself to the ground because I saw that person with a weapon and I was fearful, I felt threatened." Because the man had a gun, Galvez "put [his] head on the ground and . . . stayed there fearful" until the man left the bank. Galvez stated that he felt like he had to stay on the floor because he was "scared and there was an armed man there and [he] did not know what was going to happen."

Galvez testified that he was five feet, four inches tall and that the robber was taller than that. Galvez later discovered a black BB pistol in the mulch located in the bed of his truck, which had been parked in the bank's parking lot during the robbery.

The bank's drive-through teller, Gary Grooms, heard Caison scream. He turned to see a man carrying a black ABC bag and holding a small pistol in his right hand. Grooms testified that the man was using the gun to "direct" tellers to fill the bag with money and that the man was "forceful" and "[d]emanding." Grooms put money in the bag, then the perpetrator told Grooms

---

[2] Galvez testified at trial using a language interpreter. He indicated that he did not understand what the robber was saying in the bank.

to help gather more money. Grooms remembered that he "might have" put money from another teller's drawer into the bag.

A customer outside the bank, Mauricio Trigo, photographed the robber as he was leaving the bank. He observed the robber enter the passenger side of a white Acura that was parked on the street. Trigo described the driver of the Acura as a "big person."

Around "lunchtime" of the day of the robbery, Deliese Ganzert, an employee of a BB&T bank located near the Wells Fargo Bank, noticed a white Acura parking in a lot close to her. Being on alert because of incidents occurring in her bank, she wrote down the license plate number of the Acura. She observed that a "shorter and heftier" black man was driving the Acura and a "taller and thinner" black man was in the passenger seat. She watched as the men "pulled on other shirts over their shirts." She positively identified Walker in court as one of the men in the Acura.

On May 25, 2016, two days after the robbery, Maryland State Trooper John Dressel stopped the white Acura in Maryland. The Acura bore the same license plate number that Ganzert had recorded on the day of the robbery, and the vehicle was registered to Walker. Ja'Michael Lindsey, Walker's brother, was driving, and Walker was the passenger. Walker had approximately $2,600 in his pocket. In the back seat of the vehicle, Dressel located a suitcase containing "about $9,060 . . . inside of a black and yellow drawstring backpack." The money had Wells Fargo bands on it and the initials of Caison and another teller. Dressel also recovered two cell phones. Dressel placed Walker in custody.[3]

A search of the electronic data of the cell phones showed that on May 23, 2016, one of the phones had a "web history" that showed a news article referencing "[a] man in a yellow vest

_____

[3] Dressel testified that his "MVA printouts" stated that "Walker is being reported as 6 feet tall and 180 pounds." Lindsey's ID card stated that he was 5'10" and 220 pounds.

robs Tackett's Mill Wells Fargo." The article had been "pulled up" "multiple times" that evening. The search also revealed that at 5:33 p.m. on May 23, 2016, a Google search was conducted for "Do sweat have DNA." Walker admitted at trial that this information was recovered from his phone, although he noted that others had access to the phone.

In an interview with Prince William County Detective Garry Mendoza, Walker told Mendoza that on May 23, 2016, he was working for Labor Ready performing a "moving job" until 3:00 p.m. Walker "waited around" for his brother to pick him up some time after 5:00 p.m. Walker also told Mendoza that he recently had purchased the white Acura.

Kathy Gray, a former assistant manager for Labor Ready, confirmed that Walker worked at Labor Ready from February 2016 through May 2016. Gray saw Walker "almost every day" and had personal interactions with him. Gray testified that Walker worked a "moving job" on May 23, 2016. A Labor Ready time sheet showed that Walker started the job at 9:00 a.m. on May 23, 2016, and a site manager "signed off for four hours," which is the minimum amount of time that Labor Ready pays associates, meaning Walker could have worked less than four hours that day.

At trial, Gray looked at photographs of the robber produced from bank surveillance video stills. According to Gray, the yellow vest worn by the robber, a Class 2 vest with reflective stripes, was "the same type" of vest issued by Labor Ready to its associates. From one of the bank surveillance camera photographs, Gray positively identified Walker as the perpetrator. She stated that she knew it was Walker even though he was wearing a mask in the photograph because Walker began working for the company in the "colder months" when "a lot of the workers come in very bundled up so you learn to recognize them when they're coming in." She also recognized Walker because she had worked with him for four months and he came into the office almost every day looking for work.

Prince William County Police Officer R.T. Griffin found a reflective vest and a gray hoodie on the side of the road not far from the bank. A pair of work gloves was inside the vest. Farther down the road, officers found a pair of wet blue jeans and a black ski mask. There was not enough DNA present on the vest or the sweatshirt to develop a DNA profile. A forensic scientist developed a DNA mixture profile from the mask and could not eliminate Walker as a major contributor to this DNA mixture profile. A forensic scientist also developed a DNA mixture profile from a sample taken from inside the interior waist of the jeans, and she could not eliminate Walker as a contributor to this DNA profile.

Walker presented alibi evidence that he was working as a mover at the time of the robbery, testifying that he worked two jobs on May 23, 2016, one of which was from 12:00 p.m. until 6:00 p.m. According to Walker and his witnesses, the robbery was committed by his brother Ja'Michael, who also was known as "Mike." Walker identified his brother as the robber from the still photographs taken from the bank surveillance camera. Walker also claimed that he did not know that money was in his car when he and Mike were stopped in Maryland. To explain why he had not provided police with all of the information supporting his claimed alibi, Walker testified that he "didn't get the chance to go into everything" about his whereabouts on May 23, 2016 during his interview with Mendoza.

Prior to trial, Walker filed a motion *in limine* asking the trial court to exclude any in-court identification of him by a witness, "unless the witness has already been vetted in their ability to identify the suspect in a blind six-man photo lineup with only there [sic] eyes showing, because the suspect wore a ski mask." Walker argued that the in-court identification would be highly suggestive with its prejudicial value outweighing the probative value.

At the hearing on the motion, Walker contended that to permit an in-court identification would be overly prejudicial because "[y]ou can tell the defendant from everyone else in the

- 6 -

courtroom." Walker argued that a witness should not be allowed to identify him in court unless the witness could choose him from a lineup or photo array where all the individuals were wearing masks that exposed only their eyes. The trial court denied Walker's motion.

Walker also moved to suppress the contents of the cell phones recovered from when he was taken into custody. He argued that the digital search of the cell phones was not executed "forthwith" as required by Code § 19.2-56. He also challenged the warrant as void because the search had not been conducted within fifteen days of the issuance of the warrant.

At the hearing on Walker's motion to suppress, Detective Mendoza testified that on June 1, 2016, Mendoza and a Maryland State Police trooper obtained a Maryland warrant permitting the Maryland State Police trooper to take the cell phones from Walker's personal property at the Montgomery County Detention Center where Walker was being held. The Maryland trooper gave the phones to Mendoza, who inventoried them in the Prince William County Police Department's property section.

On June 23, 2016 at 12:15 a.m., Mendoza obtained a Virginia search warrant allowing a search of the contents of the cell phones, including electronically stored data. That same day, Mendoza requested that the Prince William County Police Department send the phones to their department's in-house Digital Forensics Unit and that their own Digital Forensics Unit search the phones. Mendoza attached the Virginia search warrant to his request. Mendoza explained that he did not obtain the Virginia search warrant until June 23, 2016 because he was involved with many ongoing investigations during that time.

On July 5, 2016, Sergeant Whaley from the Digital Forensics Unit submitted a request to have the phones sent to the Unit, and the phones were transported to the Unit on July 8, 2016 by a member of the criminal evidence section. Detective Jonathan Kennedy began the process of extracting the data from the cell phones on July 25, 2016, and the extraction and processing of

the data was concluded on July 28, 2016. The Search Inventory and Return was filed on July 28, 2016, and it stated that the warrant was executed on June 23, 2016 at 12:35 a.m.

In denying the suppression motion, the trial court stated that the case was "unique on two planes." First, the phones had to be transferred between two jurisdictions. Second, the case involved "information within the phone," which requires particular expertise to retrieve. The trial court rejected Walker's contentions, explaining that there is no "hard and fast rule" to the time limit in which this warrant needed to be executed. Instead, the trial court focused on the fact that the parties acted reasonably and lawfully in obtaining the warrant. The trial court stated "that the timing involved is not what's pertinent to this case." The trial court concluded, "While there was a time lag involved, that time lag, as far as I'm concerned, is not really relevant to the issues in this case."

At the conclusion of all the evidence, the jury found Walker guilty of abduction of Galvez for pecuniary benefit, four counts of robbery of four bank employees, and four counts of use of a firearm in the commission of the underlying robberies. Prior to the jury deliberating on sentencing, the trial court instructed the jury as to the range of punishment for the offenses for which the jury had just found Walker guilty. Regarding the four use of a firearm offenses, the trial court instructed the jury that one of the offenses was a "first offense" under Code § 18.2-53.1 and that the remaining three offenses constituted "second or subsequent offenses" under Code § 18.2-53.1.[4] The jury recommended sentences consistent with the trial court's instructions.

---

[4] Code § 18.2-53.1 makes it an independent offense "to use or attempt to use any pistol, shotgun, rifle, or other firearm or display such weapon in a threatening manner while committing or attempting to commit" certain enumerated felonies, including robbery. After criminalizing such use or display, Code § 18.2-53.1 provides that "any person found guilty [of violating Code § 18.2-53.1] shall be sentenced to a mandatory minimum term of imprisonment of three years for a first conviction, and to a mandatory minimum term of five years for a second or subsequent conviction under the provisions of this section."

Walker now appeals, asserting four assignments of error. First, he contends the evidence was insufficient to support the abduction conviction because it did not allow a rational factfinder to conclude that he "seized or detained . . . Galvez" or he "had an intent to deprive . . . Galvez of his personal liberty."[5] Next, he argues that the trial court erred in its sentencing instructions by instructing the jury that three of the four convictions for use of a firearm in the commission of a robbery were to be considered "second or subsequent" convictions under Code § 18.2-53.1. He further contends that "[t]he trial court erred by allowing . . . Caison's in-court identification of [him] as the masked perpetrator" and "further erred by denying [him] a protective procedure" regarding the identification. Finally, he contends that the trial court erred in denying his motion to suppress the evidence obtained from a search of his cell phones.

## ANALYSIS

### I. Abduction of Galvez

In challenging the trial court's denial of his motion to strike the abduction charge, Walker necessarily asserts that the jury should not have been allowed to even consider the charge because "[a] motion to strike challenges whether the evidence is sufficient to submit the case to the jury." *Linnon v. Commonwealth*, 287 Va. 92, 98 (2014) (quoting *Lawlor v. Commonwealth*, 285 Va. 187, 223 (2013)). As a result, his challenge raises the question of whether the evidence adduced sufficiently presented "a *prima facie* case [of abduction] for consideration by the" jury. *Vay v. Commonwealth*, 67 Va. App. 236, 249 (2017) (quoting *Hawkins v. Commonwealth*, 64 Va. App. 650, 657 (2015)).

---

[5] The abduction indictment specifically identified Galvez as the victim of the abduction. Accordingly, the conviction is based on Walker's interactions with Galvez. Walker's interactions with the tellers and others are not pertinent to the abduction charge except to the extent that they shed light on Walker's intention to detain Galvez or his restriction of Galvez's liberty.

Walker was indicted for abducting Galvez.  The statutory offense of abduction is set out in Code § 18.2-47(A).[6]  In pertinent part, that code section provides that "[a]ny person who, by force, intimidation or deception, and without legal justification or excuse, seizes, takes, transports, detains or secretes another person with the intent to deprive such other person of his personal liberty . . . shall be deemed guilty of 'abduction.'"

In enacting Code § 18.2-47, the General Assembly altered the common law offense of abduction.  As we previously have recognized, the statute "'supercedes the common law' and effectively combines the common law offenses of kidnapping, abduction, and false imprisonment 'into one statutory felony.'"  *Walker v. Commonwealth*, 47 Va. App. 114, 120 (2005) (quoting John L. Costello, *Virginia Criminal Law & Procedure* § 7.1, at 119-20 (3d ed. 2002)), *aff'd*, 272 Va. 511 (2006).  While a common law abduction required asportation of the victim, that requirement "did not survive" the enactment of Code § 18.2-47(A).  *Id.*  Thus, although movement of the victim can establish that he or she has been abducted,[7] it is no longer necessary with "mere detention" of the victim being sufficient to meet the statutory requirement. *Walker*, 272 Va. at 517.

By expanding what could satisfy the elements of abduction, the General Assembly focused on *control over* the victim as opposed to mere *movement of* the victim.  The list of

---

[6] The indictment specifically charged and the jury convicted Walker of abduction in violation of Code § 18.2-48.  The elements of abduction are set out in Code § 18.2-47(A), and Code § 18.2-48 provides for enhanced penalties for abduction in certain defined circumstances. On appeal, Walker challenges only that the evidence failed to create a jury issue regarding specific elements of abduction as set out in Code § 18.2-47; he does not assert that the special circumstances necessary to subject him to an enhanced penalty under Code § 18.2-48 were not established.

[7] The statute's inclusion of the word "transports" makes clear that an abduction still may be proven by the forced movement of a victim.  Thus, while no longer a necessary element of the offense, asportation of the victim remains a potentially sufficient manner of proving the offense of abduction.

- 10 -

pertinent verbs in Code § 18.2-47, "seizes, takes, transports, detains or secretes[,]" all involve assertion of some measure of control over the victim.  It is immaterial whether the manifestation of that control is demonstrated by moving the victim or causing the victim to remain in a place.  Thus, an abduction occurs when a perpetrator, by means of "force, intimidation or deception, and without legal justification or excuse," exercises control over the victim "with the intent to deprive such [victim] of his personal liberty."  Code § 18.2-47(A).

Walker asserts that the evidence failed to raise a jury issue regarding two of these elements.  He argues there was insufficient evidence adduced to allow a rational factfinder to conclude that he seized or detained Galvez or that he had the intent to deprive Galvez of his liberty.  "Whether the evidence adduced is sufficient to prove each of those elements is a factual finding, which will not be set aside on appeal unless it is plainly wrong."  *Vay*, 67 Va. App. at 249 (quoting *Linnon*, 287 Va. at 98).  In determining whether sufficient evidence was adduced, "we consider the evidence in the light most favorable to the Commonwealth and give it the benefit of all reasonable inferences fairly deducible therefrom."  *Lawlor*, 285 Va. at 224.

## A.  Seizure or detention

In making the argument that he never detained or seized Galvez, Walker concedes that he committed an assault and battery upon Galvez and that, as a result, he "inflicted injury, with force and violence, with the intent to do bodily harm."  He asserts that the evidence proves nothing more because he never verbally "ordered or otherwise directed . . . Galvez to the ground or [to] remain in the bank" and the blow struck did not knock Galvez to the ground, but rather, Galvez "went to the ground on his own accord and choice."

In essence, Walker argues that Galvez made a voluntary decision to lie on the floor and remain there during the robbery, and therefore, Walker never seized or detained Galvez.  This

argument stretches the concept of voluntariness beyond its breaking point and ignores the context—an ongoing bank robbery—in which the events occurred.

It is true that Walker's blow to Galvez's head and neck did not knock Galvez to the ground. It also may be true that Walker did not verbally command Galvez to the ground or to remain in place.[8] It is equally true, and the jury reasonably found, that Walker, by his actions, caused Galvez to go to the ground and remain there for the duration of the bank robbery.

It cannot be seriously disputed that Galvez went to the ground because Walker, having struck him, was waving a gun while committing a bank robbery. Testimony established that Walker was pointing the gun "everywhere" and at "everybody[.]" According to Galvez, he was afraid and "threw [himself] to the ground because" Walker had a gun. Furthermore, Galvez made clear that he remained on the floor for the duration of the bank robbery because he was fearful of Walker and the gun Walker was displaying in a threatening manner. These decisions and thoughts by Galvez represent a reasonable response by a bank customer who already had been assaulted in the midst of an ongoing bank robbery. Given the context of the situation, the jury reasonably concluded that Walker, by his threatening actions, induced fear in Galvez and exercised control over Galvez, causing Galvez to go to the floor and remain there for the duration of the robbery. Thus, the evidence was sufficient to support the conclusion that Walker seized or detained Galvez within the intendment of Code § 18.2-47(A).

B. Intention to deprive Galvez of his personal liberty

Walker next argues that "[e]ven assuming . . . that [he] detained or seized . . . Galvez, the evidence was insufficient to prove that [he] intended to deprive . . . Galvez of [Galvez's]

---

[8] The record reflects that, after striking Galvez, Walker said something to Galvez, but that, given his lack of command of English, Galvez did not understand what Walker said.

personal liberty." We disagree that the evidence was insufficient to create a jury issue regarding intent.

"Intent may be, and most often is, proven by circumstantial evidence and the reasonable inferences to be drawn from proven facts." *Salazar v. Commonwealth*, 66 Va. App. 569, 579 (2016) (quoting *Viney v. Commonwealth*, 269 Va. 296, 301 (2005)). Here, as detailed above, the circumstances were that Walker was engaged in the commission of a bank robbery. As a result of a series of actions, Walker, in fact, asserted control over Galvez, causing him to fall to the floor and remain there during the duration of the bank robbery. Galvez's response reasonably can be characterized as the natural and probable consequence of Walker's actions.

Walker argues that this is insufficient for two reasons. First, he notes that in *Commonwealth v. Herring*, 288 Va. 59, 75 (2014), the Supreme Court held that although "a person can be presumed to intend the natural and probable consequences of his actions," the intent element of abduction is not established by mere evidence of detention alone because Code § 18.2-47(A) contains "*both* a detention and a specific intent element[.]" Second, Walker asserts that the evidence only supports the conclusion that it was "his intent to rob the bank of money" and not that he had the "intent to restrain [Galvez]'s liberty."

Although a detention alone is not dispositive of the intent question, "proof of" detention "may be used to establish" such an intent so long as "evidence [is] presented [to] establish both elements beyond a reasonable doubt." *Burton v. Commonwealth*, 281 Va. 622, 628 (2011). Furthermore, "[w]hen a defendant accomplishes an abduction by seizing . . . a victim, it *may* be a reasonable inference just from those physical actions that the defendant's intent was to deprive the victim of [his] personal liberty." *Id.* (emphasis added).

The jury reasonably could draw such an inference here. In fact, given that Walker never attempted to rob or take anything from Galvez, it is hard to fathom another intention. In the

- 13 -

context of a bank robbery, a perpetrator's only reason to interact with customers from whom he does not seek money is to limit their ability to interfere in his or her interactions with the bank tellers from whom he or she does seek money.[9]  Here, Walker had no prior relationship with Galvez, had no reason to bear him ill will, and had no reason to interact with him at all except that Galvez was a potential impediment to Walker's plan to commit bank robbery.  Given context and the lack of any other potential intention, the evidence was more than sufficient for the jury to consider and ultimately conclude that all of Walker's actions towards Galvez, from striking him to waving the gun around, were designed to control Galvez's movements so as to facilitate the robbery of the tellers.

Recognizing the lack of any other potential motive regarding Galvez, Walker asserts that, because his overarching intention was to facilitate the bank robbery, he could not have possessed the necessary intent to restrict Galvez's liberty.  This argument fails because a perpetrator may possess multiple intents at the same time.  In *Barnes v. Commonwealth*, 234 Va. 130 (1987), "Barnes seized [the victim] in the parking lot and used him as a decoy to gain access to the store which, by Barnes' own admission, he intended to rob."  234 Va. at 137.  The fact that Barnes' ultimate intention was robbery of those in the store did not preclude him from being guilty of the abduction in the parking lot.  The Supreme Court held "that abducting a person as a means of gaining access to the scene or otherwise facilitating the commission of an intended robbery likewise violates" Code § 18.2-48.  *Id.*; *see also Lozano-Bolanos v. Commonwealth*,

---

[9] The fact that Walker did not attempt to rob Galvez distinguishes this case from *Burton*, 281 Va. 622, and *Johnson v. Commonwealth*, 221 Va. 872 (1981), cases relied upon by Walker. In those cases, the Supreme Court found that each defendant's intention regarding their respective victims involved sexual gratification and not a limitation on liberty with any such limitation being merely incidental to the sexual motivation.  Here, there was sufficient evidence presented for a jury to consider and ultimately conclude that Walker's intention with regard to Galvez was to control his movements even if the overarching purpose of Walker's enterprise was the robbery of others.

- 14 -

No. 0711-13-4, slip op. at 5-6 (Va. Ct. App. Apr. 1, 2014) (recognizing that "it is entirely possible for a defendant to harbor an intent that satisfies two separate crimes" and that "[a]n intent to batter the victim . . . does not exclude the possibility of a simultaneous intent to abduct"). Simply put, the fact that the perpetrator has a motive in addition to restricting a victim's liberty does not prevent a reasonable conclusion that the perpetrator also intended to restrict a victim's liberty. Thus, Walker's admitted intention to commit bank robbery does not negate that he simultaneously harbored the intent to restrict Galvez's liberty.

Such multiple intentions are a component of a violation of Code § 18.2-48. As noted in footnote 6 above, a conviction under Code § 18.2-48 requires that the Commonwealth prove all of the elements of abduction, including that the defendant acted "with the intent to deprive [the victim] of his personal liberty." Code § 18.2-47(A). The additional elements of Code § 18.2-48 require the Commonwealth to prove more, such as a simultaneous "intent to extort money or pecuniary benefit" or an "intent to defile[.]" Thus, to be guilty of abduction for pecuniary benefit in violation of Code § 18.2-48, Walker had to possess *both* the intent to deprive Galvez of his liberty and an intent to achieve pecuniary gain. Given the necessity of both intents existing simultaneously, the establishment of one does not negate the existence of the other.

At a minimum, the evidence presented at trial was sufficient to raise jury questions as to whether Walker seized or detained Galvez and whether he had the intent to deprive Galvez of his personal liberty.[10] Accordingly, the trial court did not err in denying Walker's motion to strike.

---

[10] In holding that the evidence here is sufficient, we do not hold that every assault and battery represents an abduction. *See Lozano-Bolanos*, No. 0711-13-4, slip op. at 5 ("In the assault context, a person engaged in a fight might grab another pugilist's clothing during the melee, thereby preventing that person from moving about freely. Depending on the facts presented, such a scenario may rule out an intent to abduct."). In addition to some assaults failing to satisfy the intent requirement for abduction, some will fail to establish the necessary degree of control described above. Evidence that a single punch, or even a series of punches, knocked a victim to the ground may demonstrate that the victim has been moved, but, absent other facts, it does not establish abduction.

- 15 -

## II. Use of a firearm charges as second or subsequent offenses

The jury having returned guilty verdicts on multiple charges, including the four counts of use of a firearm in the commission of the four underlying robberies of the bank employees, the trial court proceeded to instruct the jury regarding sentencing. Consistent with Code § 18.2-53.1, the trial court instructed the jury that each use of a firearm charge carried with it a mandatory minimum sentence. Specifically, the statute provides that a person convicted "shall be sentenced to a mandatory minimum term of imprisonment of three years for a first conviction, and to a mandatory minimum term of five years for a second or subsequent conviction[.]" Interpreting this language, the trial court instructed the jury to impose a three-year sentence for the first charge of use of a firearm for which the jury had found Walker guilty and separate five-year sentences for each of the other three counts of use of a firearm charges for which the jury had found him guilty.

Walker argues on appeal that these sentencing instructions were in error. He notes that the enhanced mandatory minimum sentence provision of Code § 18.2-53.1 applies to "second or subsequent conviction[s]" for violating Code § 18.2-53.1. He argues that the jury's findings of guilt on the charges were not "convictions" because "jury guilty verdicts do not become convictions until the trial court enters a sentencing order."

In support of his argument, Walker relies on our decision in *Batts v. Commonwealth*, 30 Va. App. 1 (1999). In *Batts*, the defendant was tried in *separate* proceedings for separate instances of using a firearm in the commission of separate felonies. 30 Va. App. at 5. In the first proceeding, a jury had returned a guilty verdict on the use of a firearm charge, but no sentencing order had been entered because the sentencing hearing had been continued (at the request of Batts) to a date after his trial on the next use of a firearm charge was to take place. *Id.* at 5-6. In the second proceeding, the trial court instructed the jury that, based on the jury's finding of guilt

in the prior proceeding, it was required to impose the enhanced mandatory minimum sentence found in Code § 18.2-53.1 because the finding of guilt in the second proceeding represented a second or subsequent conviction. *Id.* at 7-8.

Stating that the "jury's verdict in th[e first proceeding] was not a final conviction without the entry of the sentencing order[,]" we concluded that the jury's finding of guilt in the first proceeding "could not be used to establish the predicate first offense" in the second proceeding. *Id.* at 12. Walker argues that the reasoning of *Batts* dictates that we find "the trial court erred in instructing the jury to apply the mandatory minimum sentence for a second or subsequent conviction for three of the four use of a firearm charges."

While having some surface appeal, this argument ignores a key distinction between *Batts* and this case—*Batts* involved charges contested in separate prosecutions while all of the findings of guilt in this case arise from a single prosecution. One of the issues that drove our decision in *Batts* was the possibility that, after the second jury had convicted Batts of a second offense of use of a firearm and he was sentenced to the associated enhanced penalty, the guilty verdict in the first proceeding would be set aside, leaving no first conviction. That is, in fact, what happened in *Batts*, with the judge in the first proceeding "set[ting] aside the jury verdict on the firearm conviction in the first, unrelated case[,]" meaning Batts was sentenced for a second conviction despite there being no valid prior conviction. *Id.* at 9.

Such an outcome is not possible when the multiple violations of Code § 18.2-53.1 are tried in a single prosecution. If a trial court declines to adopt the jury's guilty verdict for one or more of multiple use-of-a-firearm charges in a single prosecution, it necessarily will eliminate the "second or subsequent" convictions first and continue that process until there is only one (or perhaps no) such conviction. Thus, in the single prosecution context, a defendant cannot be

sentenced to the enhanced five-year mandatory minimum for a second conviction without the trial court having convicted of a predicate first such offense.

The Supreme Court's decision in *Ansell v. Commonwealth*, 219 Va. 759 (1979), confirms that this represents a distinction with a difference. The defendant in *Ansell* was charged and convicted in a single proceeding for multiple felonies, including three charges for use of a firearm in violation of Code § 18.2-53.1. 219 Va. at 760-61. Having found Ansell guilty of three violations of Code § 18.2-53.1, the trial court "appl[ied] the enhanced punishment provision of the statute to" two of the three convictions. *Id.* at 761. The Supreme Court affirmed, "hold[ing] that the trial court did not err in imposing upon Ansell" enhanced sentences for two of "his three violations of Code § 18.2-53.1." *Id.* at 763. Thus, as *Ansell* makes clear, when multiple violations of Code § 18.2-53.1 are tried in a single prosecution, a finding of guilt on one of the charges serves as the predicate conviction rendering any other findings of guilt "second or subsequent convictions" for the purpose of the enhanced sentencing provision of Code § 18.2-53.1.

Because, unlike the situation in *Batts*, all of the use-of-a-firearm charges against Walker were tried in a single prosecution, the trial court did not err in instructing the jury at sentencing that the second, third, and fourth guilty findings were to be treated as second or subsequent convictions subject to the enhanced sentencing provision of Code § 18.2-53.1.[11]

---

[11] We consistently have applied the "single prosecution" rule to recidivist statutes that impose higher penalties for multiple convictions/offenses. *See, e.g.*, *Jefferson v. Commonwealth*, 33 Va. App. 230, 239 (2000) (recognizing that, for violations of Code § 18.2-53.1, "[t]he predicate and subsequent offenses may be prosecuted in the same proceeding"), *aff'd on reh'g en banc*, 35 Va. App. 436 (2001); *Mason v. Commonwealth*, 16 Va. App. 260, 262-63 (1993) (holding that, for violations of Code § 18.2-248, "an enhanced punishment may be applied where there are multiple convictions for separate offenses in a simultaneous prosecution"); *see also* *Totten v. Commonwealth*, No. 0259-05-3, slip op. at 6-7 (Va. Ct. App. May 9, 2006) (reconciling the decisions in *Ansell* and *Batts* by noting *Batts* involved multiple prosecutions and thus did not offend "the Supreme Court's ruling in *Ansell* that a defendant may be subjected to the enhanced penalty provisions of Code § 18.2-53.1 when tried for multiple offenses in the same

III.  Caison's in-court identification of Walker

Walker challenges the trial court's decision to allow Caison's trial testimony identifying him as the perpetrator.  Ordinarily, "[d]ecisions regarding the admissibility of evidence 'lie within the trial court's sound discretion and will not be disturbed on appeal absent an abuse of discretion.'"  *Blankenship v. Commonwealth*, 69 Va. App. 692, 697 (2019) (quoting *Michels v. Commonwealth*, 47 Va. App. 461, 465 (2006)).  When, as here, a litigant contends that his "due process rights are violated by the admission of evidence[,]" he presents "a question of law . . . to which we apply a *de novo* standard of review."  *Johnson v. Commonwealth*, 296 Va. 266, 274 (2018) (quoting *Henderson v. Commonwealth*, 285 Va. 318, 329 (2013)).

In the vast majority of contested criminal trials, a witness will take the stand and testify under oath that the defendant, who is present in the courtroom, is the person who committed the crime.  It happens routinely in trials conducted in the courts of the Commonwealth and has happened for as long as there have been such trials and courts.  Despite the fact such a question and answer in the course of a criminal trial was a common occurrence when the Virginia Declaration of Rights was adopted in 1776, when the Bill of Rights was ratified in 1791, when the Fourteenth Amendment was ratified in 1868, and when every subsequent version of the Virginia Constitution has been ratified, Walker contends that such questions and answers potentially offend the due process protections enshrined in each of the referenced documents.[12]

---

proceeding").  We note that, if the "single prosecution" rule were insufficient to distinguish *Ansell* and *Batts*, the decision in *Ansell*, a decision of the Supreme Court, would control.

[12] Walker contends that the trial court violated his due process rights guaranteed by both the United States and Virginia constitutions.  Although the respective clauses use similar language, some have suggested that those similarities do not compel the conclusion that they mean the same thing.  *See Palmer v. Atl. Coast Pipeline, LLC*, 293 Va. 573, 586 (2017) (McCullough, J., concurring) (noting that, despite the similarity of language, "whatever interpretation the United States Supreme Court has adopted for the Due Process Clauses of the Fifth and Fourteenth Amendments of the Constitution of the *United States* does not bind us in determining the meaning of the Due Process Clause of the Constitution of *Virginia*"); *but see*

Analogizing Caison's in-court identification of him to tainted "showup" procedures, Walker asserts that the trial court's decision to allow Caison's in-court identification testimony violated his due process rights. Walker argues that in-court identifications are inherently suggestive and that the identification in this case was especially so because "[h]e represented himself and was the only person at the defense table" when Caison was asked to identify the perpetrator. He argues that, given the inherent suggestiveness of in-court identifications and the fact that Caison had not identified him previously, due process required that the trial court exclude the identification or put procedural safeguards in place before admitting the identification testimony.

It is true, as Walker asserts, that suggestive identification procedures in the investigation of crimes can so taint the identification as to raise due process concerns regarding admitting the identification at trial. So called "showups"—out-of-court identifications in which the police present an eyewitness with only one person to consider as the potential perpetrator—are one such procedure. *See generally Manson v. Brathwaite*, 432 U.S. 98 (1977); *Neil v. Biggers*, 409 U.S. 188 (1972). "Synthesizing" the rule of decision in these cases, the Supreme Court has recognized that the Due Process Clause is implicated "only when law enforcement officers use an identification procedure that is both suggestive and unnecessary[,]" *Perry v. New Hampshire*, 565 U.S. 228, 238-39 (2012), and that even such circumstances do not automatically require suppression of a witness' identification of a perpetrator.

---

*Jackson v. W.*, 14 Va. App. 391, 405 n.11 (1992) (noting the similarity of language and stating that "our analysis of the due process issue applies equally to both state and federal law"). Here, Walker, relying on federal and out-of-state cases applying the United States Constitution, makes no argument that the Due Process Clause of the Virginia Constitution would afford him protections not also provided by the United States Constitution. Accordingly, we assume but do not decide that, in this context, the protections afforded by each due process clause are coterminous.

To the extent that the conduct of law enforcement is so suggestive as to undermine the reliability of the witness' identification, "the Due Process Clause requires courts to assess, on a case-by-case basis, whether improper police conduct created a 'substantial likelihood of misidentification.'" *Id.* at 239 (quoting *Biggers*, 409 U.S. at 201). Suppression of even tainted identifications occurs only "[w]here the 'indicators of [a witness'] ability to make an accurate identification' are 'outweighed by the corrupting effect' of law enforcement suggestion[.]" *Id.* (second alteration in original) (quoting *Brathwaite*, 432 U.S. at 114, 116). "Otherwise," the identification "(if admissible in all other respects) should be submitted to the jury." *Id.*

Citing the decisions of the Connecticut Supreme Court in *State v. Dickson*, 141 A.3d 810 (Conn. 2016), the United States Court of Appeals for the Second Circuit in *United States v. Archibald*, 734 F.2d 938 (2d Cir. 1984), and the United States Court of Appeals for the Fifth Circuit in *United States v. Rogers*, 126 F.3d 655 (5th Cir. 1997), Walker seeks to extend the rule of *Biggers* and *Brathwaite* to in-court identifications even in circumstances in which neither law enforcement nor the State as a whole has engaged in any improper or even suggestive behavior pretrial. Rather, Walker invites us to adopt the reasoning of these courts that one would be "hard-pressed to imagine . . . a *more* suggestive identification procedure than placing a witness on the stand in open court, confronting the witness with the person who the state has accused of committing the crime, and then asking the witness if he can identify the person who committed the crime[,]" *Dickson*, 141 A.3d at 822, and therefore, to conclude that "first time in-court identifications, like in-court identifications that are tainted by an unduly suggestive out-of-court identification, implicate due process protections and must be prescreened by the trial court[,]" *id.* at 824. We decline the invitation.

We find the reasoning and rationale Walker advances inconsistent with the Supreme Court's delineation of the relevant due process interest in *Perry*. Justice Ginsburg's opinion for

the Court in *Perry* makes clear that, in this context, due process concerns arise when the identification is the result of "improper police conduct[,]" 565 U.S. at 241, that involves an identification procedure that was "unnecessary[,]" *id.* at 239. Traditional in-court identifications of the type Walker complains of fall in neither category. They are not the result of improper conduct, but rather, occur in the normal and wholly ordinary course of a criminal trial.[13] Indeed, in-court identifications are necessary in the ordinary, if not absolute, meaning of the word because the identity of the perpetrator always will be an element of the offense that the government must prove to a jury beyond a reasonable doubt.

In refusing to extend the rationale of *Biggers* and *Brathwaite* beyond instances of police misconduct, the *Perry* Court made clear that it was aware that other situations may result in "suggestive" identifications, noting that "[m]ost eyewitness identifications involve some element of suggestion. *Indeed, all in-court identifications do*." *Id.* at 244 (emphasis added). Having recognized such circumstances, the United States Supreme Court rejected the notion that due process requires suppression of such identifications or that trial courts adopt the special procedures Walker seeks here. Rather, the *Perry* Court concluded that a defendant sufficiently is protected from the dangers of misidentification resulting from normal, in-court identifications by the normal protections the Constitution provides a criminal defendant, noting that

> [i]n our system of justice, fair trial for persons charged with criminal offenses is secured by the Sixth Amendment, which guarantees to defendants the right to counsel, compulsory process to obtain defense witnesses, and the opportunity to cross-examine witnesses for the prosecution. Those safeguards apart, admission of evidence in state trials is ordinarily governed by state law, and

---

[13] Walker asks us to extend the rule from identifications initiated by the police to include those initiated by non-police actors, such as Commonwealth's Attorneys. We do not reach this question because, whether the rule applies to just police or to both police and prosecutors, it requires "improper . . . conduct." *Perry*, 565 U.S. at 241. Given that in-court identifications of the type complained of have long been a routine part of criminal trials, we decline to find them to be "improper" within the meaning of *Perry*.

the reliability of relevant testimony typically falls within the province of the jury to determine.

*Id.* at 231-32. Having recognized these protections, the high Court held that

[w]hen no improper law enforcement activity is involved, . . . it suffices to test reliability through the rights and opportunities generally designed for that purpose, notably, . . . vigorous cross-examination, protective rules of evidence, and jury instructions on both the fallibility of eyewitness identification and the requirement that guilt be proved beyond a reasonable doubt.

*Id.* at 233.

This view, that due process does not require relief of the type sought by Walker, is hardly unique to this Court. Although Walker and the dissent have marshaled a limited number of out-of-state cases in support of his position, the overwhelming majority of courts entertaining the question have rejected Walker's argument.[14] *See, e.g.*, *United States v. Thomas*, 849 F.3d 906, 910 (10th Cir. 2017); *Lee v. Foster*, 750 F.3d 687, 691 (7th Cir. 2014); *United States v. Hughes*, 562 F. App'x 393, 398 (6th Cir. 2014); *United States v. Whatley*, 719 F.3d 1206, 1216 (11th Cir. 2013)[15]; *United States v. Domina*, 784 F.2d 1361, 1368 (9th Cir. 1986); *Garner v. People*, 436

---

[14] Indeed, we note that, on multiple occasions, the dissent relies upon *dissenting* opinions from non-Virginia courts. These citations are not only not the law in Virginia, but also are not the law in the jurisdictions in which they were rendered.

[15] We find the Eleventh Circuit's decision in *Whatley* particularly instructive because of its factual similarities to the instant case. In *Whatley*, the Eleventh Circuit held:

Under *Perry*, the admission of the in-court identifications of Whatley did not violate his right to due process because he cannot establish that the suggestive circumstances of the identifications were the result of improper police conduct. Whatley argues that the in-court identifications were unnecessarily suggestive because he was seated at the defense counsel table, he was the only African–American man in the courtroom other than courtroom personnel, he had never been identified in a line-up or array of photographs before trial, and he was first seen by the bank employee witnesses during their testimony. But these circumstances were not the result of improper police conduct. Whatley had a constitutional right to be present at his trial, and it is

P.3d 1107, 1120 (Colo. 2019) (*en banc*); *Byrd v. State*, 25 A.3d 761, 767 (Del. 2011); *State v. Doolin*, 942 N.W.2d 500, 511-12 (Iowa 2020); *Fairley v. Commonwealth*, 527 S.W.3d 792, 799-800 (Ky. 2017); *State v. King*, 934 A.2d 556, 561 (N.H. 2007); *State v. Ramirez*, 409 P.3d 902, 913 (N.M. 2017); *People v. Brazeau*, 304 A.D.2d 254, 257 (N.Y. 2003); *State v. Hickman*, 330 P.3d 551, 572 (Or. 2014) (*en banc*), *modified on reconsideration*, 343 P.3d 634 (Or. 2015) (*en banc*) (*per curiam*); *State v. Lewis*, 609 S.E.2d 515, 518 (S.C. 2005). We find the reasoning of these decisions both more persuasive and more consistent with the United States Supreme Court's decision in *Perry* than the cases relied upon by Walker.[16]

Accordingly, we conclude that the trial court did not err in admitting Caison's in-court identification of Walker as the perpetrator or in refusing Walker's request to implement protective procedures.[17]

---

> customary for the defendant to be seated at the table with his counsel. Whatley did not have a constitutional right to a pre-trial line-up or array of photographs.

719 F.3d at 1216 (internal citation omitted).

[16] To buttress its positions, the dissent claims to be applying "*Perry*'s central logic" and the "logic of *Perry*[.]" To do so, the dissent avoids engaging with much of the actual *language* of *Perry*. For example, the language of *Perry* draws a distinction between in-court identifications and out-of-court identifications. 565 U.S. at 241. Similarly, although the dissent finds that the "logic" of *Perry* compels the conclusion that ordinary protections afforded a criminal defendant are insufficient, Justice Ginsburg makes clear that those protections are substantial and provide sufficient safeguards except in the most extraordinary circumstances. *See id.* at 248 ("Given the safeguards generally applicable in criminal trials, . . . we hold that the introduction of [the] eyewitness testimony, without a preliminary judicial assessment of its reliability, did not render Perry's trial fundamentally unfair."). It is this language that binds us; not a conception of the opinion's "logic[,]" central or otherwise.

[17] Walker also argues that Caison's testimony should have been excluded under Virginia Rule of Evidence 2:403, asserting that the danger of unfair prejudice outweighed the probative value of the testimony. The testimony identifying him as the robber was prejudicial to Walker; of course, all pertinent evidence is prejudicial to someone. The test is whether the evidence is unfairly prejudicial and whether that unfair prejudice outweighs the probative value of the evidence. Allowing a victim to identify the perpetrator of the crime is not unfair. Furthermore, there is little that is more probative in a criminal trial than the identity of the perpetrator.

- 24 -

IV. Denial of Walker's motion to suppress

In his final assignment of error, Walker argues that the trial court erred in denying his motion to suppress the incriminating evidence recovered in a search of his cell phones. He asserts that the Commonwealth failed to comply with Code § 19.2-56(A) when it executed the search warrant related to the cell phones, rendering the search warrant "void[.]"[18] From this premise, he reasons that the search of his cell phones constituted a warrantless search not within any exception to the Fourth Amendment's warrant requirement, and thus, the evidence

Accordingly, having concluded that the testimony had significant probative value and that it was not *unfairly* prejudicial, we reject Walker's argument that Rule 2:403 required exclusion of Caison's testimony.

The dissent's criticism of our resolution of Walker's Rule 2:403 argument, like most of the positions advanced by the dissent, appears to be tied to the dissent's distrust of eyewitness identifications and the jury's traditional role as factfinder. Without question, eyewitnesses make mistakes; however, that does not render eyewitness testimony unfairly prejudicial or raise the specter of a due process violation requiring us to prevent the jury from performing its traditional role as factfinder. *Perry*, 565 U.S. at 245 ("The fallibility of eyewitness evidence does not, without the taint of improper state conduct, warrant a due process rule requiring a trial court to screen such evidence for reliability before allowing the jury to assess its creditworthiness.").

Although not referenced by Walker, the dissent raises the specter that, perhaps, Virginia Rule of Evidence 2:402(a) might preclude such identification testimony in a future case. Rule 2:402(a) provides that, unless otherwise barred, "[a]ll relevant evidence is admissible" and that "[e]vidence that is not relevant is not admissible." "Evidence is relevant if it tends to prove or disprove, or is pertinent to, matters in issue." *Kenner v. Commonwealth*, 299 Va. 414, 425 (2021) (quoting *Clay v. Commonwealth*, 262 Va. 253, 257 (2001)); *see also* Va. R. Evid. 2:401 ("'Relevant evidence' means evidence having *any* tendency to make the existence of any fact in issue more probable or less probable than it would be without the evidence." (emphasis added)). By definition, identity will be a matter "in issue" in any case in which a defendant is challenging an identification. It is hard to see how an eyewitness' identification of the perpetrator would not be relevant under this standard. Thus, with the exception of rare cases such as those involving drug-induced testimony or testimony while under hypnosis, *see Archie v. Commonwealth*, 14 Va. App. 684, 692 (1992), witness identifications are likely to be relevant under Rule 2:402(a).

[18] In pertinent part, Code § 19.2-56(A) provides that "[a]ny search warrant not executed within 15 days after issuance thereof shall be returned to, and voided by, the officer who issued such search warrant." Walker contends that for a search warrant to have been "executed" within the meaning of Code § 19.2-56(A), the search it authorizes must have been "fully completed[.]" He reasons that, because the incriminating data was extracted from his cell phones more than fifteen days from the issuance of the search warrant, the warrant was not executed within the time frame set out in the statute.

- 25 -

discovered on his cell phones should have been suppressed. Questions of statutory interpretation and constitutional law represent questions of law subject to *de novo* review in this Court. *See generally Gallagher v. Commonwealth*, 284 Va. 444, 449 (2012).

Even if we were to agree with Walker that the warrant was not executed within the time frame set forth in Code § 19.2-56(A), he still would not be entitled to the remedy—suppression—that he seeks.[19] "[A] mere violation of state statutory law does not require that the offending evidence be suppressed, unless the statute expressly provides for an evidentiary exclusion remedy." *Seaton v. Commonwealth*, 42 Va. App. 739, 757 n.7 (2004). Code § 19.2-56(A) provides for no such remedy.[20]

Given that Code § 19.2-56(A) does not provide for suppression of the evidence, Walker argues that the requirements of Code § 19.2-56(A) inform the analysis of whether the search was permissible under the Fourth Amendment to the point that the statute's requirements and any associated protections effectively become part and parcel of the Fourth Amendment itself. This simply is not the law.

---

[19] "The doctrine of judicial restraint dictates that we decide cases on the best and narrowest grounds available." *Commonwealth v. Swann*, 290 Va. 194, 196 (2015) (internal quotation marks and citations omitted). Because doing so is not necessary to our resolution of the appeal, we do not address what constitutes timely execution of a warrant for the purpose of Code § 19.2-56(A).

[20] That the General Assembly knows how to create a statutory suppression remedy for violation of a statute is demonstrated by Code § 19.2-56(B). That subsection, first adopted by the General Assembly in 2020, 2020 Va. Acts Spec. Sess. I chs. 31, 37, prohibits "no-knock" search warrants and specifically provides that "evidence obtained from a search warrant in violation of this *subsection* shall not be admitted into evidence for the Commonwealth in any prosecution." Code § 19.2-56(B) (emphasis added). The fact that subsection (B) contains language requiring the suppression of evidence obtained in violation of subsection (B) and subsection (A) contains no similar language regarding violations of subsection (A) inexorably leads to the conclusion that the General Assembly did not create a suppression remedy for violations of Code § 19.2-56(A).

A "defect in the validity of the warrant under state law does not, of itself, invalidate the warrant under the United States Constitution." *Commonwealth v. Campbell*, 294 Va. 486, 495 (2017). Thus, although states may "go above the Fourth Amendment minimum, the Constitution's protections concerning search and seizure remain the same." *Virginia v. Moore*, 553 U.S. 164, 173 (2008). Accordingly, the United States Supreme Court consistently has rejected arguments like Walker's that "whether or not a search is reasonable within the meaning of the Fourth Amendment depends on the law of the particular State in which the search occurs." *California v. Greenwood*, 486 U.S. 35, 43 (1988).

Because Walker does not even suggest that the search in this case violated the Fourth Amendment save for the purported violation of Code § 19.2-56(A), his Fourth Amendment argument necessarily fails. Accordingly, the trial court did not err in denying Walker's motion to suppress.

CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed.

*Affirmed.*

Lorish, J., concurring in part and dissenting in part.

Three years after a bank robbery that lasted less than one minute, Jacques Walker stood trial, *pro se*. During that trial, one of the tellers identified Walker (sitting at the defense table) as the robber, claiming to "remember his eyes." The teller acknowledged that she had only been able to see the robber's eyes, eyebrows, and skin complexion, consistent with the fact that the robber was wearing a hood and mask. When asked what about the robber's eyes resembled Walker's eyes, she could not provide an answer. In the years before trial, during which Walker continuously denied that he was the robber, the police elected not to show the teller a photo lineup of any kind—even when Walker specifically requested the same. And the court refused to perform any screening of this witness identification to ensure it was reliable before permitting the teller to testify.

I am constrained by our precedent to agree with the majority that the evidence was sufficient to uphold the abduction count, and to uphold the application of recidivist five-year mandatory minimum penalties for each of the second, third, and fourth firearm counts collected within this one-minute robbery (although I include brief remarks on this topic below). I also agree that there is no statutory remedy of exclusion that could apply to the delayed search of the cell phones in this case.

But our resolution of each of these assignments of error assumes that there was sufficient admissible evidence to prove that Walker was, in fact, the robber. On this question, I join the Fourth, Seventh, and D.C. Circuits, as well as several state appellate courts, in concluding that due process requires more where an identification takes place, for the first time, in the courtroom. I would hold that an initial identification during trial is unnecessarily suggestive and that, therefore, the court should have applied the *Biggers* factors to determine whether, under the totality of the circumstances, the teller's identification of Walker was reliable enough to be

- 28 -

presented to the jury.  *See Winston v. Commonwealth*, 268 Va. 564, 593 (2004) (citing *Neil v. Biggers*, 409 U.S. 188, 198-99 (1972)); *see also, e.g.*, *United States v. Greene*, 704 F.3d 298, 307 (4th Cir. 2013) (concluding due process requires a trial court to screen an initial in-court identification).  Instead, the majority opinion draws an arbitrary line based on the *per se*, and incorrect, determination that in-court identifications can *never* be unduly suggestive.  Applied here, the *Biggers* factors readily establish that the identification should have been excluded.  Alternatively, this evidence should have been excluded as more prejudicial than probative.  In either event, I would reverse and remand for a new trial.  For the following reasons, I respectfully dissent.

> I.  *Virginia has long recognized the due process concerns with suggestive witness identifications, and for good reason.*

The United States Supreme Court has broadcast the inherent issues with eyewitness identification for more than fifty years.  *See United States v. Wade*, 388 U.S. 218, 228 (1967) ("[The] vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification.").  Our courts have likewise "long recognized [the] dangers inherent in eyewitness identification testimony."  *Daniels v. Commonwealth*, 275 Va. 460, 464 (2008); *see also Watson v. Commonwealth*, 298 Va. 197, 211 (2019) (McCullough, J., concurring) ("Extensive social science research has uncovered a variety of phenomena that may mislead a factfinder into crediting flawed eyewitness testimony. . . .  [A] witness's recollection may be tainted by suggestive police procedures, greater difficulty in making cross-racial identifications, diminished reliability due to focus on a weapon, or unconscious transference.").[21] It is "[b]ecause eyewitness identification is so persuasive to jurors" that "eyewitness

---

[21] "[B]oth archival studies and psychological research suggest that eyewitnesses are frequently mistaken in their identifications."  *Watson*, 298 Va. at 209 (quoting Jennifer L. Devenport et al., *Eyewitness Identification Evidence*, 3 Psych. Pub. Pol'y & L. 338, 338 (1997)).

'[m]isidentification is widely recognized as the single greatest cause of wrongful convictions in this country.'" *Id.* at 209 (quoting *State v. Henderson*, 27 A.3d 872, 885 (N.J. 2011)).

The issue is, and has always been, suggestiveness. When the circumstances of a witness' identification of a suspect are unduly suggestive, the witness' independent memory and will are functionally overridden and any subsequent identification is categorically unreliable. *See Biggers*, 409 U.S. at 198 ("Suggestive confrontations are disapproved because they increase the likelihood of misidentification, and unnecessarily suggestive ones are condemned for the further reason that the increased chance of misidentification is gratuitous."). Looking at the "relationship between suggestiveness and misidentification," the Supreme Court explained that "the primary evil to be avoided is 'a very substantial likelihood of irreparable misidentification.'" *Id.* (quoting *Simmons v. United States*, 390 U.S. 377, 384 (1968)). It is this "likelihood of misidentification which violates a defendant's right to due process." *Id.* Only in rare instances like this—when evidence "is so extremely unfair that its admission violates fundamental conceptions of justice"—has the Supreme Court imposed a constraint tied to the Due Process Clause in this way. *Perry v. New Hampshire*, 565 U.S. 228, 237 (2012) (quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990)).

Our precedent has adopted a two-prong due process screen to evaluate witness identifications. First, a court must evaluate whether the circumstances surrounding the identification were "unnecessarily suggestive." *Winston*, 268 Va. at 593 (quoting *Biggers*, 409 U.S. at 198-99). Second, the court must determine "whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive." *Id.* In assessing an identification under this second prong, we have adopted the factors set out in *Biggers*, which require a court to consider:

> the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the

- 30 -

witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Townes v. Commonwealth*, 234 Va. 307, 331 (1987) (quoting *Biggers*, 409 U.S. at 199-200).

Our prior cases, however, concerned only out-of-court, pretrial identifications. This case asks us to consider whether first-time, in-court identifications are different in any meaningful way. Because I conclude they are not, I cannot agree with the majority's refusal to apply traditional due process considerations here.

II. *It is arbitrary to draw a line between out-of-court and in-court identifications, so the traditional due process screen must occur in both circumstances.*

*Biggers* was not the first decision of the Supreme Court to address witness misidentification. Fifty years ago, the Court established that witness identification could be so prejudicial that it affected the admissibility, and not merely the weight, of identification testimony at trial. *Simmons*, 390 U.S. at 384; *Stovall v. Denno*, 388 U.S. 293, 302 (1967), *abrogated on other grounds by United States v. Johnson*, 457 U.S. 537 (1982).

*Simmons* shows that the risk of irreparable misidentification applies equally whether the initial identification takes place out of court, or in court. The issue in *Simmons* was whether a conviction based on eyewitness identification *at trial* following a *pretrial* "identification by photograph" must be set aside. 390 U.S. at 384. Five bank tellers were first shown a suggestive photo array before trial, and they identified Simmons as the robber. The tellers then identified him again during his trial. *Id.*

The Supreme Court rejected the premise that cross-examination alone could counter the potential risk of misidentification following suggestive identification procedures. *Id.* Instead, the Court balanced whether cross-examination could mitigate the risks of suggestive identifications: "[c]onvictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic

- 31 -

identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Id.* Each case must be considered "on its own facts." *Id.*

After *Simmons* established this standard for determining "whether an in-court identification would be admissible in the wake of a suggestive out-of-court identification," the Supreme Court applied the test in *Biggers* for "the admissibility of *testimony* concerning the out-of-court identification itself." *Biggers*, 409 U.S. at 198 (emphasis added).

Combining *Simmons* and *Biggers*, there is no meaningful due process distinction that divides in-court and out-of-court identifications. In both circumstances, due process requires a court to "screen" whether a state-arranged witness identification is, or was, impermissibly suggestive. If the answer is yes, the court then determines whether the identification is still reliable considering the rest of the circumstances. This has been the test for more than fifty years, making the majority position the one that deviates from tradition.

Other courts have recognized the same. The "due process concerns are identical in both [in-court and out-of-court identifications] and any attempt to draw a line based on the time the allegedly suggestive identification takes place seems arbitrary." *United States v. Hill*, 967 F.2d 226, 232 (6th Cir. 1992). All of the concerns the due process screen accounts for, "including the degree of suggestiveness, the chance of mistake, and the threat to due process[,] are no less applicable when the identification takes place for the first time at trial." *Id.* Initial in-court identifications "present a suggestive situation in which it is not clear whether the witness's own recollections, or outside pressures, are driving the testimony," and therefore trigger all the same due process concerns. *Greene*, 704 F.3d at 307; *see also City of Billings v. Nolan*, 383 P.3d 219, 225 (Mont. 2016) ("While we recognize that it is a common practice for an identification to be made in court of the defendant, under the circumstances here, and when the defendant has never

- 32 -

been previously identified by the victim, we conclude the in-court identification of [defendant] was impermissibly suggestive.").

   *III. As several other courts have recognized,* Perry *does not require a different result.*

The majority glosses over the full lineup of Supreme Court witness identification cases, choosing to focus only on *Perry*. With this narrow lens, the majority mistakenly concludes that, under *Perry*, due process concerns are only triggered for a witness identification when the police improperly arrange an unnecessarily suggestive pretrial identification.

Unlike this case, *Perry* did not involve a challenge to an in-court witness identification. Instead, *Perry* considered only whether due process prohibits the introduction of a prior out-of-court identification at trial. 565 U.S. at 235. Since *Perry* "did not involve an in-court identification at all" it "cannot set the standard for how we should treat one." *United States v. Whatley*, 719 F.3d 1206, 1216 (11th Cir. 2013) (Barron, J., concurring in part and dissenting in part).

In *Perry*, a witness to a car break-in called the police from her home to make a report. 565 U.S. at 234. She was describing what she had seen, when she looked out her window and remarked that the person who committed the break-in "was standing in the parking lot, next to the police officer." *Id.* The Supreme Court found no issue with this identification because there was no improper police conduct in arranging the circumstances. *Id.* As a result, there was no need for a "due process check for reliability," and traditional trial protections were sufficient. *Id.*

Far from clarifying whether due process concerns are implicated by an initial in-court identification, "[t]he courts are divided [after *Perry* as to] whether a reliability analysis is required to admit an in-court identification." *United States v. Shumpert*, 889 F.3d 488, 491 (8th Cir. 2018) (collecting cases). The majority joins the majority side of this split, interpreting *Perry* to only require due process checks in the wake of police-arranged suggestive eyewitness

identifications before trial.  Because I believe *Perry*'s central logic demands due process checks for all state-arranged, suggestive identifications, I am compelled to endorse the view expressed by the Fourth, Seventh, and D.C. Circuits, as well as the Supreme Court of Montana.  *See Greene*, 704 F.3d at 298 (applying the *Biggers* factors to an initial in-court identification post-*Perry*); *United States v. Morgan*, 248 F. Supp. 3d 208, 212 (D.D.C. 2017) (distinguishing *Perry* and finding that "[a]n in-court identification of defendant would be 'arranged by law enforcement' because the government . . . would be choosing to ask the witness for an identification at his trial") (internal citation omitted); *Lee v. Foster*, 750 F.3d 687 (7th Cir. 2014) (citing *Perry* and then applying the *Biggers* factors to an in-court identification); *Nolan*, 83 P.3d at 224 (assuming the *Biggers* factors applied to an in-court identification without discussing *Perry*).[22]  Of some note, the Supreme Courts of Connecticut and Massachusetts have required even more robust due process protections than those found in *Biggers* alone.  *State v. Dickson*, 141 A.3d 810, 828 (Conn. 2016); *Commonwealth v. Crayton*, 21 N.E.3d 157, 157 (Mass. 2014).

*Perry* understandably focused on police action—because the challenge in *Perry* was to a pretrial identification in the presence of police.  The cases preceding *Perry*, and the logic of *Perry* itself, confirm that the broader concern is "the presence of *state* action," not limited to police alone.  *Dickson*, 141 A.3d at 828 (emphasis added).  Indeed, there is no principled reason

---

[22] That *Perry* (in dicta) disclaims routine preliminary due process screening for *every* in-court witness identification says nothing of the unique concerns in an *initial* in-court identification.  It is true that "one-on-one in-court identifications do not always implicate the defendant's due process rights, as when identity is not an issue or where there has been a nonsuggestive out-of-court identification procedure."  *State v. Dickson*, 141 A.3d 810, 828 (Conn. 2016).  But because a first time in-court identification was not before the Court in *Perry*, "the passing, general reference by the court in *Perry* to the propriety of in-court identifications" does not foreclose the "conclusion that they can implicate due process concerns under certain circumstances."  *Id.*; *see also Garner v. People*, 436 P.3d 1107, 1123 (Colo. 2019) (Hart, J., dissenting) (concluding that *Perry* may foreclose the possibility that the Supreme Court intended for *all* in-court identifications to be subject to pre-screening, but leaves open whether due process requires the screening of especially suggestive in-court identifications).

- 34 -

"why, if an in-court identification following an unduly suggestive pretrial police procedure implicates the defendant's due process rights because it is the result of state action, the same would not be true when a prosecutor elicits a first time in-court identification." *Id.* at 824; *see also Wade*, 388 U.S. at 233 ("[T]he confrontation *compelled by the State* between the accused and the victim or witnesses . . . is peculiarly riddled with innumerable dangers and variable factors which might seriously, even crucially, derogate from a fair trial." (emphasis added)).

The majority brushes aside whether the rule in *Perry* extends to "non-police actors, such as Commonwealth's Attorneys" because "whether the rule applies to just police or to both police and prosecutors," *Perry* requires "improper" conduct. Because in-court identifications "have long been a routine part of criminal trials," the majority finds nothing "improper" here. In reaching this conclusion, the majority seemingly attaches nefarious intent to the word "improper." But *Perr*y equates "improper" conduct with what is "suggestive and unnecessary." 565 U.S. at 239. Thus, the suggestiveness of the identification itself, without any reason why it was necessary, determines whether there was "improper" conduct. *See also Webster's Third New International Dictionary Unabridged* 1137 (2021) (defining "improper" as "not accordant with fact, truth, or right procedure").

The rule the majority adopts will "set a dangerous precedent and invite gamesmanship." *State v. Doolin*, 942 N.W.2d 500, 543 (Iowa 2020) (Appel, J., dissenting). "Specifically, if the state is concerned that an eyewitness might be uncertain, it could avoid a nonsuggestive lineup or photo array, and instead present the witness in-court where the defendant is on trial," which is "the most suggestive environment imaginable." *Id.* In this case, police and prosecutors had three years between the bank robbery and trial to ask the teller to identify the robber from a proper photo-array. But they elected not to do so here, and now will have no reason to do so in future cases either.

*IV. An initial in-court identification is even more suggestive than a one-photo lineup or a "showup."*

The majority acknowledges that there are suggestive identification procedures that "can so taint the identification as to raise due process concerns regarding admitting the identification at trial." As we have explained, "[t]he unduly-suggestive test presupposes that the power of suggestion" can distort the witness' "recollection of the individual she accuses of the crime or in some other way implies that the police are singling out a photo as the man who they believe committed the crime." *Smith v. Commonwealth*, 61 Va. App. 112, 119-20 (2012). We have described the suggestive effect as akin to saying to the witness, "*This* is the man." *Id.* at 120 (quoting *Foster v. California*, 394 U.S. 440, 443 (1969)).

One such problematic procedure is the "showup" where "the police present an eyewitness with only one person to consider as the potential perpetrator." *See generally Manson v. Braithwaite*, 432 U.S. 98, 98 (1977). Another is where a photo array includes "pictures of several persons among which the photograph of a single such individual recurs or is in some way emphasized," and in this way "bait[s] the victim to think the police believe he is indeed 'the man.'" *Smith*, 61 Va. App. at 120 (internal quotations omitted). We have also offered that it would be unduly suggestive for a photo to be "impermissibly emphasized so as to attract the victim's selection, as where it alone includes characteristics unique to the victim's reported observations, or where the photo is specifically singled out as one of the suspects being investigated by the police." *Id.* And, finally, we have explained that "it may be 'impermissibly suggestive' to depict 'only the defendant wearing a shirt of the color described by witnesses.'" *Id.* (quoting *Jarrett v. Headley*, 802 F.2d 34, 41 (2d Cir. 1986)). "Put another way, if a victim claimed she was shot by a man wearing a hat, it might be unduly suggestive for a photo array to include only one man (the one the police suspect to be the shooter) wearing a hat." *Id.*

A first-time, in-court identification carries even greater risks. In the courtroom, on the morning of trial, the defendant is no longer merely "specifically singled out as one of the suspects being investigated by the police." *Id.* The defendant is now *the person* the police, and the prosecutor, have said the evidence points to. *See Simmons*, 390 U.S. at 383 ("The chance of misidentification is also heightened if the police indicate to the witness that they have other evidence that one of the persons pictured committed the crime."). That the defendant is on trial makes clear to a witness that "*this* is the man." *See, e.g., Perry*, 565 U.S. at 244 (noting that all in-court identifications "involve some element of suggestion"). Witnesses faced with such a circumstance "may identify the defendant out of reliance on the prosecutor and in conformity with what is expected of them rather than because their memory is reliable." *Crayton*, 21 N.E.3d at 166-67.[23]

The immense pressure to conform, combined with the inherent suggestiveness of the courtroom setting, produces fertile breeding ground for potential misidentification (when there was no pretrial identification procedure).

_____

[23] Initial in-court identifications "present a suggestive situation in which it is not clear whether the witness's own recollections, or outside pressures, are driving the testimony." *Greene*, 704 F.3d at 307; *see also United States v. Archibald*, 734 F.2d 934, 941 (finding that the defendant being seated at defense counsel table was "a circumstance obviously suggestive to witnesses asked to make in-court identifications"), *modified on other grounds*, 756 F.2d 223 (2d Cir. 1984); *United States v. Rogers*, 126 F.3d 655, 658 (5th Cir. 1977) ("[I]t is obviously suggestive to ask a witness to identify a perpetrator in the courtroom when it is clear who is the defendant."); *United States v. Williams*, 436 F.2d 1166, 1168 (9th Cir. 1970) ("When asked to point to the robber, an identification witness—particularly if he has some familiarity with courtroom procedures—is quite likely to look immediately at the counsel table, where the defendant is conspicuously seated in relative isolation. Thus the usual physical setting of a trial may itself provide a suggestive setting for an eye-witness identification."), *cert. denied,* 402 U.S. 912 (1971). "The social environment surrounding in-court identifications produces an immensely strong commitment effect." Dan Simon, *In Doubt: The Psychology of the Criminal Process* 155 (Harv. Univ. Press 2012). An eyewitness may feel that failing to identify the defendant will make him appear incompetent, unreliable, or unhelpful. *Id.* at 155-56.

*V. The majority's appeal to the "tradition" of in-court identifications and the efficacy of "traditional" trial protections falls short in the face of the inherent risks of misidentification here.*

The majority takes pains to repeat that in-court identifications are historical, and traditional, and therefore unable to trigger due process protection.[24] But "the fact that a criminal procedure has roots in tradition does not necessarily mean it is constitutional." *Dickson*, 141 A.3d at 833. In this case, the Supreme Court first recognized due process concerns with suggestive witness identification procedures more than fifty years ago. *Stovall*, 388 U.S. at 302.[25] And the Supreme Court quickly applied this same due process screen for an *in-court* misidentification. *Simmons*, 390 U.S. at 384. It is the majority that rejects the more than half-century tradition of recognizing due process protections for unduly suggestive witness identifications.

Appealing to tradition once again, the majority finds that the normal protections the Constitution provides for a criminal defendant sufficiently guard against the dangers of misidentification for in-court identifications, so no additional due process screen is necessary. Without discussing the way that these normal protections actually apply in an initial in-court

---

[24] If the majority gestures to the history at common law, "the reason that eyewitness identifications played a predominant role in early English and American history is that a large proportion of criminals who were brought into court had been caught in the act by private parties, not because first time in-court eyewitness testimony was deemed to be particularly reliable." *Dickson*, 141 A.3d at 833 (citing John H. Langbein, *The Criminal Trial before the Lawyers*, 45 U. Chi. L. Rev. 263, 281 n.56 (1978) ("By today's standards a striking proportion of the Old Bailey cases involved defendants caught in the act or taken with stolen goods. We can understand why identification evidence would predominate in an age before professional policing and well before the developments of scientific techniques for generating and evaluating many of the types of circumstantial evidence now familiar to us [such as fingerprints].")).

[25] In this same period, the Court first recognized the "novel" constitutional rights to be represented by counsel, to attend non-segregated schools, and to marital privacy—each contravening long-standing tradition and history.

- 38 -

identification, the majority again looks to *Perry* for mooring; but, as discussed above, *Perry* does not address this either.

The Supreme Court of Virginia has recognized the broad consensus in both state and federal courts that "courts should guard against a jury assuming that admitted eyewitness identification testimony is unquestionably reliable and credible simply because it was admitted in evidence." *Daniels*, 275 Va. at 465; *Watson*, 298 Va. at 208-09. But are "vigorous cross-examination, protective rules of evidence, and jury instructions on both the fallibility of eyewitness identification and the requirement that guilt be proved beyond a reasonable doubt" sufficient when applied to initial in-court identifications?

Beginning with cross-examination, it is well accepted that "cross-examination is far better at exposing lies than at countering sincere but mistaken beliefs." *Dickson*, 141 A.3d at 832 (internal quotation omitted).[26]

> [W]hen the state places the witness under the glare of scrutiny in
> the courtroom and informs the witness of the identity of the person
> who has been charged with committing the crime, it is far less
> likely that the witness will be hesitant or uncertain when asked if
> that person is the perpetrator.

*Id.* at 831.

What is more, "[a] witness who mistakenly believes that he is accurately identifying the defendant will come across in cross-examination as quite sincere and confident." *Garner*, 436 P.3d at 1122 (Hart, J., dissenting). "[W]hile confidence 'is not a reliable predictor of the

---

[26] Cross-examination is not a sufficient tool when a witness believes in the identification but is mistaken. Jules Epstein, *The Great Engine that Couldn't: Science, Mistaken Identification, and the Limits of Cross-Examination*, 36 Stetson L. Rev. 727, 774, n.210 (2007).

accuracy of the identification, especially where the level of confidence is inflated by its suggestiveness[,]' *Crayton*, 21 N.E.3d at 168, confidence can be very persuasive to a jury." *Id.*[27]

This problem is made worse because eyewitness confidence "is the single most influential factor in juror determinations regarding the accuracy of an eyewitness identification," *State v. Lawson*, 291 P.3d 673, 705 (Or. 2012) (reviewing studies), and this same confidence makes it "very hard for cross-examination to undercut an in-court identification[,]" *Garner*, 436 P.3d at 1122. As a result, cross-examination "cannot always be expected to reveal an inaccurate in-court identification where most jurors are unaware of the weak correlation between confidence and accuracy and of witness susceptibility to manipulation by suggestive procedures or confirming feedback." *Commonwealth v. Collins*, 21 N.E.3d 528, 536 (Mass. 2014) (quoting Supreme Court Judicial Court Study Group on Eyewitness Evidence: Report and Recommendations to the Justices 20 (July 25, 2013)).

Indeed, a large body of jury studies shows that misplaced eyewitness confidence can strongly influence jurors and cause them to disregard other key aspects of the testimony bearing on its reliability.[28] In one mock trial experiment, jurors were told about a grocery store robbery.

---

[27] "[T]here is almost nothing more convincing than a live human being who takes the stand, points a finger and the defendant, and says 'That's the one!'" *Watkins v. Sowders*, 449 U.S. 341, 352 (1981) (Brennan, J., dissenting); *United States v. Correa-Osorio*, 784 F.3d 11, 29 (1st Cir. 2015) (Barron, J., concurring in part and dissenting in part) ("Eyewitness testimony is undeniably powerful. That testimony is all the more powerful when the eyewitness identifies the defendant right in front of the jury."); *Hill*, 967 F.2d at 231 ("[O]f all the evidence that may be presented to the jury, a witness'[s] in-court statement that 'he is the one' is probably the most dramatic and persuasive."); *Henderson*, 27 A.3d at 889 ("[T]here is almost nothing *more convincing* [to a jury] than" eyewitness identification of the defendant. (quoting *Watkins*, 449 U.S. at 352) (Brennan, J., dissenting)).

[28] *See, e.g.*, Elizabeth F. Loftus, James M. Doyle & Jennifer E. Dysart, *Eyewitness Testimony: Civil and Criminal*, 120, 121 n.4 (5th ed. 2013) (citing Brian L. Cutler et al., *Juror Decision-Making in Eyewitness Identification Cases*, 12 L. & Hum. Behav. 41 (1988)); Amy L. Bradfield & Gary L. Wells, *The Perceived Validity of Eyewitness Identification Testimony: A Test of the Five* Biggers *Criteria*, 24 L. & Hum. Behav. 581 (2000); Neil Brewer & Anne Burke, *Effects of Testimonial Inconsistencies and Eyewitness Confidence on Mock-Juror Judgments*, 26

Elizabeth F. Loftus, *Reconstructing Memory: The Incredible Eyewitness*, 8 Psych. Today 116 (1974). When the evidence did not include an eyewitness identification, jurors voted to convict only eighteen percent of the time. With the same evidence plus an eyewitness, the rate rose to seventy-two percent. With the same evidence, plus an eyewitness subject to cross-examination revealing the eyewitness was *legally blind,* sixty-eight percent of jurors still voted to convict. *See also Lawson*, 291 P.3d at 695 (citing R.C.L. Lindsey et al., *Can People Detect Eyewitness-Identification Inaccuracy Within and Across Situations?*, 66 J. Applied Psych. 79 (1981), another study that found jurors believed eighty percent of accurate eyewitnesses and nearly eighty percent of inaccurate eyewitnesses despite both sets of witnesses being cross-examined).

A limiting jury instruction is also not enough. Many jurors are unaware that eyewitness evidence is so unreliable.[29] "[P]eople believe that witnesses are considerably more likely to be accurate than they actually are." Melissa Boyce et al., *Belief of Eyewitness Identification Evidence*, Handbook of Eyewitness Psychology: Memory for People 508-09 (2007). Unlike many other jurisdictions, Virginia does not require jury instruction about the fallibility of eyewitness identifications. *Watson*, 298 Va. at 211 (upholding trial court's refusal to give a proposed jury instruction on eyewitness identification).

Expert testimony is also incapable of successfully displacing the incredible power of the eyewitness. To begin with, a trial court retains discretion to permit or forbid expert testimony on identification evidence. Our Supreme Court has upheld a trial court's refusal to allow expert

---

L. & Hum. Behav. 353 (2002); Brian L. Cutler et al., *Juror Sensitivity to Eyewitness Identification Evidence*, 14 L. & Hum. Behav. 185 (1990).

[29] Eyewitness identification is "among the least reliable forms of evidence." *See United States v. Brownlee*, 454 F.3d 131, 142 (3d Cir. 2006); Daniel S. Medwed, *Anatomy of a Wrongful Conviction: Theoretical Implications and Practical Solutions*, 51 Vill. L. Rev. 337, 358 (2006).

testimony on misplaced eyewitness confidence because the notion that eyewitnesses would be overconfident in their identification, and grow more confident over time, fell within the jury's common knowledge. *Id.* This Court has also upheld a trial court's refusal to allow expert testimony on flaws with eyewitness identifications where there was no evidence of those flaws being present in the case. *Rodriguez v. Commonwealth*, 20 Va. App. 122, 128 (1995).

Finally, the majority opinion itself establishes that the rules of evidence will apparently be of little use, concluding that this eyewitness identification was more probative than prejudicial (a separate problem I take up in more detail below).

With cross-examination ineffective in these cases, with no requirement of a jury instruction on the problems of witness identification, and without the ability to introduce effective expert testimony in these cases, "traditional" trial protections are not enough.

### VI. *Applying* Biggers *to initial in-court identifications would place an insignificant burden on trial courts.*

Trial courts routinely determine the admissibility of evidence. Finding that initial in-court identifications are unduly suggestive and requiring the court to undertake the two-part screening described in *Winston* adds no meaningful burden. And because the *Biggers* factors have almost uniformly led to the *inclusion*, not *exclusion* of witness identification evidence, this screening is also unlikely to preclude much evidence.[30]

Even if this did create a burden, the prosecution could always avoid it by readily arranging a non-suggestive photo lineup before trial. A blinded photo array "can be assembled quickly and does not require the physical presence of the suspect or any other individuals." Memorandum of Sally Q. Yates, Deputy Attorney General, Department of Justice, Eyewitness

---

[30] *See, e.g.*, *Greene*, 704 F.3d at 298; *Satcher v. Commonwealth*, 244 Va. 220 (1992); *Townes*, 234 Va. 307; *Cuffee v. Commonwealth*, 61 Va. App. 353 (2013); *Blevins v. Commonwealth*, 40 Va. App. 412 (2003), *aff'd*, 267 Va. 291 (2004).

Identification:  Procedures for Conducting Photo Arrays (January 6, 2017).  Outside of

extraordinary circumstances, there is simply no reason why law enforcement should be unable to

conduct an out-of-court identification procedure in the time between the commission of the

alleged crime and trial, which is often months or even years, as was the case here.

The ease of conducting a non-suggestive photo lineup, combined with the fact that the

*Biggers* factors do not accord with scientific understandings of misidentification,[31] has led some

courts and jurists to conclude that initial in-court identifications should be *per se* inadmissible

absent some showing of extraordinary circumstances.  *See Garner*, 436 P.3d at 1121; *Crayton*,

21 N.E.3d at 157, 166; *see also Doolin*, 942 N.W.2d at 557-60 (Appel, J., dissenting).  While

such a conclusion may be best as a matter of policy, I find no grounding for the same in

Virginia's existing interpretation of the federal due process clause.[32]

> *VII.  Applied here, the* Biggers *factors compel the conclusion that the teller's
> unnecessarily suggestive identification was not reliable.*

To assess whether this initial in-court identification was reliable, despite the unduly

suggestive nature of the environment, the trial court should have considered the factors set out in

*Biggers*.  *See Townes*, 234 Va. at 331.

In *Biggers*, the victim spent a "considerable period of time with her assailant, up to half

an hour."  409 U.S. at 200.  The victim was "with him under adequate artificial light in her house

and under a full moon outdoors, and at least twice, once in the house and later in the woods,

faced him directly and intimately."  *Id.*  The Supreme Court remarked that "[h]er description to

the police, which included the assailant's approximate age, height, weight, complexion, skin

---

[31] The shortcomings with the *Biggers* factors are well-catalogued in Justice Appel's dissent in *Doolin*, 942 N.W.2d at 516, which advocates instead for a framework based in the due process clause of the Iowa Constitution.

[32] But, as the majority notes, Virginia's due process clause may well afford additional protections to criminal defendants.

texture, build, and voice, might not have satisfied Proust but was more than ordinarily thorough."

*Id.*

But here, the teller's interaction with the robber lasted less than one minute—and occurred three years before the trial.[33] For at least part of that minute, she was kneeling behind the counter. She never gave a detailed description of the robber to police then. At trial, she testified that she was (understandably) focused on the gun in the robber's hand.[34] While she was very close to him ("within arm's reach"), all she could see were his eyes. When asked at trial what she recalled about his eyes, she had no answer.

The ready conclusion here is that the teller's identification was not reliable.

*VIII. The witness identification, in this particular case, was more prejudicial than probative and should have been excluded under Virginia Rule of Evidence 2:403.*

Walker also separately challenged the admissibility of the identification evidence under Rule 2:403. The majority breezily rejects this challenge, but I conclude this is a separate source of error.

The majority appears to concede, as it must, that in-court identifications are often highly prejudicial to the defendant, but still concludes that this identification was not substantially more prejudicial than probative under Rule 2:403. Another case may take up whether an in-court identification under similar circumstances is reliable enough to be relevant and admissible under

---

[33] "[S]cientific research has demonstrated that eyewitness identifications are less reliable with the passage of time." *Garner*, 436 P.3d at 1122 (citing Nat'l Acad. of Sci., *Identifying the Culprit: Assessing Eyewitness Identification* 110 (2014)).

[34] Studies have shown that eyewitnesses are less reliable when a weapon is used during a crime, likely because witnesses are distracted by the weapon and therefore less able to recall peripheral details. *See generally*, Jonathan Fawcett et al., *Looking Down the Barrell of a Gun: What Do We Know About the Weapon Focus Effect?*, 5 J. of Applied Rsch. in Memory & Cognition 3 (2016).

Virginia Rule of Evidence 2:402(a).[35]  Afterall, our prior case law applies the two-prong *Biggers*

test for suggestive witness identifications.  And *Biggers* assumes that *some* identifications are not

sufficiently reliable under the totality of the circumstances for due process to be satisfied, even

where the victim believes he or she can identify the perpetrator of the crime.  Finally, there are

other forms of evidence we have held are unreliable and inadmissible—such as testimony from a

witness under hypnosis, or from a drug-induced interview—because a witness was subject to

"heightened suggestibility."  *Archie v. Commonwealth*, 14 Va. App. 684, 692 (1992).  The

"hypnotized person is ultrasuggestible, and this manifestly endangers the reliability of his

statements."  *Greenfield v. Commonwealth*, 214 Va. 710, 715-16 (1974).

The question presented here, however, is whether this in-court identification was

unreliable enough to have created an unfair risk of prejudice and confusion outweighing its thin

probative value and requiring exclusion under Rule 2:403.[36]  Because juries find eyewitness

identification to be so persuasive, the risk of prejudice is high, and the suggestive eyewitness

identification must have more than meager probative value.  I would hold that not only was the

identification here violative of Walker's due process rights, but also that its admission

contravened Rule 2:403.  As explained above, the teller viewed the perpetrator of the robbery,

who was wearing a ski mask, for less than one minute during a highly stressful situation three

years before her in-court identification.  She admitted basing her identification solely on

---

[35] This rule provides that "[a]ll relevant evidence is admissible, except as otherwise
provided by the Constitution of the United States, the Constitution of Virginia, statute, Rules of
the Supreme Court of Virginia, or other evidentiary principles.  Evidence that is not relevant is
not admissible."  Va. R. Evid. 2:402(a).

[36] In-court identifications will often be admissible under Rule 2:403, despite the
suggestibility of the identification.  For example, we can be reasonably assured of reliability (and
therefore probative value) when a witness has long known the alleged perpetrator, or where the
witness observed the defendant unobscured for significant periods of time during the offense.  In
these cases, the probative value of the identification would outweigh any prejudice to the
defendant.

Walker's eyes, yet she could not articulate what about his eyes was identifying. The identification therefore had very little probative value and should have been excluded.

> IX. *So-called recidivist penalties serve no purpose where the "subsequent" offense occurs at the same time as the initial offense.*

Finally, I concur with the majority's decision that this case is distinguishable from *Batts v. Commonwealth*, 30 Va. App. 1 (1999), and instead controlled by *Ansell v. Commonwealth*, 219 Va. 759 (1979). I write separately, however, to highlight the absurdity of applying enhanced sentences for "second or subsequent convictions" to convictions that arise out of the same criminal act or event—here, within the scope of a single minute.

The purpose of recidivist sentencing enhancements is to deter previous offenders from re-offending as well as to punish those who society views as most deserving of punishment. *Wesley v. Commonwealth*, 190 Va. 268, 276 (1949); *see also Recidivism: The Treatment of The Habitual Offender*, 7 U. Rich. L. Rev. 525, 526 (1973) ("The primary purpose of statutes authorizing additional punishment of persons convicted of a second or a subsequent offense is to warn first offenders and thus deter their criminal tendencies. By making the risks involved in perpetuating the crime so great, the intention is to deter potential recidivists.").

The United States Congress recently amended federal sentencing law in recognition of this purpose. Title 18, United States Code, Section 924(c) previously included similar language to that used in Code § 18.2-53.1, "second or subsequent conviction under this subsection." Before the amendment, federal courts universally interpreted this language as the Supreme Court of Virginia did in *Ansell* so that defendants who were convicted of multiple qualifying crimes in the same indictment would be subject to the recidivist enhancements. *See, e.g.*, *Deal v. United States*, 508 U.S. 129, 132 (1993). In 2015, the United States Sentencing Commission advised Congress to consider amending the law to make it a "true" recidivist statute and to "reduce the potential for overly severe sentences for offenders who have not previously been convicted of an

offense under section 924(c)." CRS Report R41412, Federal Mandatory Minimum Sentencing: The 18 U.S.C. 924(c) Tack-On in Cases Involving Drugs or Violence 22 (2015). In 2018, Congress made this change.[37] As a result, defendants convicted of firearms and drug offenses for the first time are no longer subject to sentencing enhancement for second or subsequent convictions arising from the same event under the federal sentencing regime.

In *Ansell*, the Supreme Court rejected the argument that the only purpose motivating recidivist statutes was to reform those previously convicted, explaining that the statute "may" have another purpose:

> [T]here is no reason not to apply the increased penalties to any subsequent offense with or without an intervening conviction "since presumably a greater penalty would be required to deter a repetition of criminal activity by an offender who has not been convicted previously than to deter repetition by the offender who has been subjected to the corrective impact of conviction and sentence."

*Ansell*, 219 Va. at 762-63 (quoting *Gonzalez v. United States*, 224 F.2d 431, 433 (1st Cir. 1955)).

Since *Ansell* and *Gonzalez* were decided, research has shown that increased statutory penalties do little to deter crime because people simply are unaware of the penalties for given offenses. *See* National Institute of Justice, *Five Things About Deterrence* (2016) ("Laws and policies designed to deter crime by focusing mainly on increasing the severity of punishment are ineffective partly because criminals know little about the sanctions for specific crimes."). This is particularly true for first-time offenders who have limited experience with the criminal justice system. Daniel S. Nagin, *Deterrence in the Twenty-First Century: A Review of the Evidence*, 42 Crime and Just. 1, 247-48 (2013). Moreover, *Ansell*'s reasoning that first-time offenders should

---

[37] The amendment replaced the phrase "second or subsequent conviction under this subsection" with "violation of this subsection that occurs after a prior conviction under this subsection has become final." First Step Act, Pub. L. No. 115-391, tit. IV, 132 Stat. 5221 (2018).

face the same sentences as repeat offenders conflicts with the bedrock notion that people should receive punishment based on their blameworthiness.

The facts here aptly illustrate the illogic of construing the statute in this way. During a single bank robbery that occurred in less than one minute, the robber brandished a firearm at four tellers and was therefore charged with four firearms offenses. If the recidivist statute had not applied, he would have received a sentence of twelve years on the firearms charges. Instead, Walker was sentenced on the latter three firearms charges as if he were a career bank robber, resulting in a penalty of eighteen years.[38]

The current state of the law in this area serves no discernable purpose and there are sufficient grounds to reconsider the reasoning inherent to *Ansell* if the General Assembly does not amend the statute.

CONCLUSION

DNA has exonerated more than 375 wrongfully convicted defendants. Over two-thirds of these exonerees were convicted in cases involving eyewitness misidentification.[39] Virginia is

---

[38] In a similar case, the United States Supreme Court recently held that the Armed Career Criminal Act (ACCA) does not apply to a person who has committed multiple offenses during a single criminal transaction. *Wooden v. United States*, ___ U.S. ___ (2022). Wooden was convicted of burglarizing ten storage units on the same evening, and the federal government argued that these convictions satisfied the ACCA's requirement of three or more violent felonies "committed on occasions different from one another." In comparing Wooden's case to an Eighth Circuit case in which that court held that the ACCA applied to Samuel Petty, who was convicted on several charges after he robbed multiple people in a restaurant, the Court explained, "A person who has robbed a restaurant and done nothing else, is not a 'habitual offender[]' or a 'career criminal[].'" *Id.*, slip op. at 13. Both Petty and Wooden's convictions "arose from a closely related set of acts occurring on the same night, at the same place—making up . . . 'a single criminal episode.'" *Id.*, slip op. at 14. So "Wooden did not become a career criminal when he moved from the second storage unit to the third, as Petty did not when he moved from the second to the third of the restaurant's patrons." *Id.*

[39] Brandon L. Garrett, *Convicting the Innocent: Where Criminal Prosecutions Go Wrong* 48 (2011) ("Eyewitnesses misidentified 76% of the exonerees (190 of 250 cases)."); Innocence Project, *Eyewitness Identification Reform*, https://www.innocenceproject.org/eyewitness-identification-reform/ (last visited Apr. 4, 2022) ("Mistaken eyewitness identifications

no exception.  Eight of the twelve petitions for writs of actual innocence that have been granted in Virginia involved eyewitness misidentification.[40]  These numbers under-represent the problem because wrongful conviction research, and actual innocence litigation, focus on serious felonies.[41]  It is clear, however, that "[f]lawed eyewitness testimony has led to a non-trivial number of wrongful convictions."  *Watson*, 298 Va. at 211 (McCullough, J., concurring).  A layperson's testimony that she remembered someone she saw for less than a minute, three years earlier, based on his eyes alone, lacks any marker of reliability and should not have been presented to the jury here without a non-suggestive pretrial identification.  For these reasons, I would reverse Walker's convictions because the eyewitness identification violated his constitutional right to due process of law.

---

contributed to approximately 69% of the more than 375 wrongful convictions in the United States overturned by post-conviction DNA evidence.").

[40] In six of these cases, biological evidence proved the defendant's innocence.  *See In re Scott*, 297 Va. 166 (2019); *In re Harward*, No. 160353, slip op. at 1-2 (Va. Apr. 7, 2016); *In re Barbour*, No. 120372, slip op. at 1-2 (Va. May 24, 2012); *In re Diamond*, No. 121462, slip op. at 1 (Va. Mar. 8, 2013); *In re Cunningham*, No. 100747, slip op. at 1 (Va. Apr. 12, 2011); *In re Haynesworth*, No. 090942, slip op. at 1-2 (Va. Sept. 18, 2009).  The other two defendants were exonerated by non-biological evidence.  *See Bush v. Commonwealth*, 68 Va. App. 797 (2018); *Haynesworth v. Commonwealth*, 59 Va. App. 197 (2011) (*en banc*).

[41]

> [M]illions of people in the United States are processed each year
> for minor or petty offenses, many of whom have inadequate or no
> defense counsel and almost all of whom plead guilty, often to
> comparatively light jail or community sentences. . . .  It is
> impossible to know how many wrongful convictions this system
> produces, but the number is likely significant.

Marvin Zalman & Robert Norris, *Measuring Innocence:  How to Think about the Rate of Wrongful Conviction*, 24 New Crim. L. Rev. 601, 651 (2021).  Virginia notably limits actual innocence petitions to those convicted of felonies.  Code § 19.2-327.2.